IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| JAMAL ANTONIO MIDDLETON, | ) | Civil Action No. 2:08-3256-CWH-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| MOTLEY RICE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

       This action has been filed by the Plaintiff, pro se, alleging discrimination against him on account of his race (African American) by the named Defendant, his former employer. Plaintiff's allegations are set out in his original Complaint (Court Docket No. 1) as amended on October 15, 2008 (Court Docket No. 14) and September 23, 2009 (Court Docket No. 96).

       The Defendant filed a motion for summary judgment and/or alternatively for partial summary judgment pursuant to Rule 56, Fed.R.Civ.P., on November 20, 2009. Plaintiff also filed his own motion for summary judgment that same date, with a brief in support of his motion being filed three days later. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on November 23, 2009, advising Plaintiff of the importance the Defendant's motion for summary judgment, and of the need for him to file an adequate response.

       The Defendant filed a redacted response in opposition to the Plaintiff's motion for



1

summary judgment on December 8, 2009. After some confusion over what documents could or could not be filed on the public record in this case, with several orders having to be issued as a result, Plaintiff filed a response in opposition to the Defendant's motion for summary judgment on February 5, 2010. The filing of this document necessitated a status conference, which was held before the Court on February 9, 2010, following which Plaintiff filed another response to the Defendant's motion for summary judgment on February 23, 2010. A reply memorandum was filed by the Defendant on March 5, 2010, and a hearing was held on April 21, 2010. Plaintiff also filed a post-hearing supplemental memorandum on April 28, 2010.

These motions are now before the Court for disposition.[1]

## **Background and Evidence**

Plaintiff alleges in his original verified Complaint[2] that he was employed by the Defendant until September 2006, when he was terminated. Plaintiff alleges that, during the period of his employment, the Defendant, through its officers, agents and employees, "engaged in acts of racial discrimination and also engaged in disparate treatment . . . ." Plaintiff further alleges that on several occasions attorney Ron Motley referred to him as "black in a demeaning manner", and that Motley has also referred to his black employees "with an ownership tag". Plaintiff alleges that when he was

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff's original complaint is verified. Therefore, the undersigned has considered the factual allegations set forth in the verified complaint as evidence for purposes of the summary judgment motions. However, the two amendments Plaintiff filed to his original complaint are not verified, and the factual allegations in those documents have therefore not been considered as evidence either for or against summary judgment in this case.

2



working on the Canadian Asbestos Team in 2005, he was not able to secure support for an asbestos review that he had been promised support for, while white employees were "given autonomy in teams of staffers . . . ." Plaintiff alleges that this resulted in the project falling behind schedule, which affected his personal evaluation.

Plaintiff further alleges that he "worked just as much and produced on or above the level of his white counterparts, or similarly situated individuals", but that he as well as other African American employees were "overlooked", while white employees would receive incentives or merit bonuses for their work. Finally, Plaintiff alleges that from on or about January 2006 until his dismissal in September 2006, he was "humiliated in front of his [peers], had his character attacked often, was constructively placed in difficult positions of employment, and was harassed almost daily." Plaintiff alleges that employees Bettina Honeycutt, supervising attorney Roger Crombie, Human Resources Director Elizabeth Branner, and Managing Partner Ann Ritter (all white) were involved in this conduct. Plaintiff seek "remedial relief" sufficient to make him "whole", as well as certain declaratory and/or injunctive relief. See generally, Original Verified Complaint.

In his first unverified amendment to his complaint, Plaintiff again alleges that attorney Ron Motley made disparaging comments about "black people", that he was never "given the autonomy and support equal to which I was promised" and that was received by white counterparts, that he was improperly denied bonuses and compensation while "many" similarly situated white employees received bonuses for performing less than equal or equal work, that he was humiliated in front of his peers, that he was discriminated against in his work assignments, that he was treated unfairly and "slander[ed]", and that, while he was being considered for termination, white employees entered his office and went "rummaging" through his office without his knowledge. In his second



3

unverified amendment to his complaint, Plaintiff adds a claim of retaliation to his complaint, although he sets forth no additional facts in support of this cause of action.

In support of summary judgment in the case, the Defendant has submitted an affidavit from Anne Ritter, who attests that at all times relevant to Plaintiff's claims, she was the managing partner of Motley Rice.[3] Ritter attests that she first became acquainted with the Plaintiff around 1994, when he came to work for the law firm of Ness, Motley, Loadholt, Richardson & Poole (Ness Motley). Ritter attests that Plaintiff had a high school degree and no prior legal experience, and that he served as a runner for approximately five years. Ritter attests that Plaintiff was well liked within the firm, and to her knowledge performed his runner duties in a satisfactory manner.

Ritter attests that, at some point, one the firm's practice groups began using Plaintiff exclusively as its runner, and that this caused some frustration between Plaintiff and his supervisor, Rose Sullivan. Plaintiff also wanted to move into another position with the firm, and Ness Motley decided to place him in a paralegal position, even though he had no prior paralegal training or experience. Ritter attests that Ness Motley provided Plaintiff training, and gave him chances to adapt to his new position over time and attempt to become successful. Ritter further attests that, although Plaintiff's formal title was changed to paralegal, he continued to perform runner-like duties, such as running errands for attorneys at trial and keeping track of documents, while also performing some other document and product identification work. Ritter attests that she attended one of the trials on which Plaintiff worked in Indiana in 2002, where attorney Ronald Motley was the lead attorney, and that there were problems surrounding Plaintiff's job performance, specifically relating to his productivity and reliability. Ritter attests that when Motley's practice group no longer needed his

---

[3]Ritter attests that, as of August 15, 2009, she is no longer employed by Motley Rice.

4



services, Plaintiff began working for other practice groups within the firm, but did not "become a permanent fixture anywhere".

Ritter attests that Ness Motley eventually dissolved, leading to the establishment of the Defendant law firm. Ritter attests that she became a member of this new firm, assuming the role of managing partner. The Defendant hired Plaintiff in 2003, and he continued serving in essentially the same position, although at some point his job title was changed to "Investigator", even though his role remained virtually unchanged. Ritter attests that the Defendant provided Plaintiff with some paralegal and other training, but that it became apparent over time that he was not well suited for this sort of evolution. Nevertheless, Plaintiff remained well liked, received pay increases annually, and continued to assist various litigation groups within the firm, although he was not permanently assigned to any specific practice area or group.

Ritter attests that because Plaintiff was essentially a "free agent" among the various practice groups during this time, he did not have any specific supervisor, but rather his work was overseen by the supervisors of the various groups he assisted, who actually saw and were familiar with his daily work product. Ritter attests that Plaintiff developed a reputation within the various practice groups as not being a particularly hard worker or possessing the requisite skills for his job title, and thus his services beyond running errands or conversing with clients or co-counsel were not in high demand, even though he continued to receive "warm reviews from his supervisor within the firm for structural purposes . . . ." Ritter attests that she was personally acquainted with Plaintiff's work for the Defendant during this time period, and found it to be wholly unsatisfactory.

Ritter attests that in 2005 Plaintiff was placed on the Canadian asbestos team, but that around December 2005 the attorney supervising that project determined that their team no longer



wanted or needed Plaintiff's help. Ritter attests that Plaintiff was not as productive as others on the team, and that the team did not feel like it needed his other services beyond document and product identification work. Ritter attests that Plaintiff was not replaced on the Canadian asbestos team, and that thereafter Plaintiff was still employed by the Defendant without any specific work assignment. Ritter attests that Plaintiff was designated as a member of the "Shared Services" team, because he was not a permanent fixture in any department or practice group, but rather his services were shared by various groups.

Ritter attests that Roger Crombie was the manager of the Shared Services Department, and as such was Plaintiff's supervisor. Ritter was Crombie's supervisor. Ritter attests that after several calls Crombie made to her expressing his concerns, he submitted a signed memorandum in July 2006[4] summarizing his observations of Plaintiff's performance, a copy of which is attached to Ritter's affidavit as Exhibit 1. Ritter attests that she has personal knowledge of the events described in Crombie's memorandum, and that she relied on the information formalized in that memorandum as well as her personal knowledge of Plaintiff's performance and performance history when she personally made the decision to terminate Plaintiff's employment with the Defendant on July 12, 2006. Ritter attests that Crombie no longer wished to work with the Plaintiff, and that although Plaintiff had requested that he be transferred to another department, no managers of other departments wanted or needed his services.

Ritter attests that, as set forth in Crombie's memorandum, Crombie initially met with the Plaintiff in late 2005 or early 2006 to discuss his employment situation, at which time Plaintiff informed Crombie that he was about to start working for the aviation practice group as an investigator.

---

[4]The affidavit says "2005", but a review of the other evidence in the case shows this to be a typographical error.



6

Ritter attests that, although Plaintiff did in fact begin working for that practice group, shortly thereafter the lead attorney for that group informed the firm that the aviation team did not want or need Plaintiff's services. Further, that group did not subsequently hire an investigator. Ritter attests that Crombie began looking for another position for Plaintiff within the firm, but that he was unable to locate any assignment for the Plaintiff until late February or early March, when a backup service representative role became available in the Client Service Center (CSC). Ritter attests that, until approximately February 2006, the only person assigned to the CSC on a full time basis was Pat Rodgers, a paralegal/administrative assistant in the Defendant's Barnwell, South Carolina office. When Rodgers took an extended medical leave in mid to late February, the CSC project manager, Bettina Honeycutt, who was a paralegal under Ritter's supervision, and Crombie decided to staff the CSC with personnel from the Defendant's Mount Pleasant office (where Plaintiff worked). Ritter attests that Patti Bernier initially assumed the lead role at CSC, but left the firm shortly thereafter and was to be replaced by Sarah Stark, who instead accepted a position in the accounting department as a lateral move. Ritter attests that throughout this period, Plaintiff was designated as the backup representative for the CSC, but that in that capacity he received only those few calls that the lead operator was not able to field personally. Ritter attests that this was Plaintiff's only assignment at the time, with this work typically consuming only a fraction on an hour a day.

Ritter attests that when the lead operator role was vacated, Crombie met with Plaintiff to see if he would be interested in the position. Crombie had not been able to identify any other position for Plaintiff with the firm. Plaintiff initially refused to accept the position unless he was provided an increase in compensation. However, Crombie told Plaintiff he could not offer a pay increase at that time, but that the assumption of the role might better position him for more recognition



for pay increases in the future. Because Plaintiff had been without a full time position for some time, Crombie suggested to Plaintiff that he either accept the role or consider searching for work elsewhere, at which time Plaintiff "reluctantly" accepted the lead operator role.

Ritter attests that two problems quickly surfaced; the first being that Plaintiff simply did not answer calls, allowing them to go to voice mail, and the second being that Plaintiff developed a practice of generating an abbreviated call log from which others could not discern whether he had actually talked to the caller or simply referred the message to the responsible paralegal. Ritter attests that Honeycutt, the CSC project manager, frequently brought these problems to her and Crombie's attention, but when Crombie presented them to the Plaintiff, he resented any supervision Honeycutt had provided, leading Crombie to agree to supervise Plaintiff's work directly and limit contact between him and Honeycutt. Ritter further attests that on one occasion, Plaintiff requested part of one day off to attend a co-worker's funeral. Ritter attests, however, that what should have been the missing of one morning at work resulted in Plaintiff not answering phone calls for two days, even though he did have time to help plan an event for another co-worker and send a firm wide email about an upcoming softball game. Ritter attests that Plaintiff never sufficiently explained why he was unable to answer calls for two days, and when Crombie approached him about this matter, Plaintiff responded by sending an insubordinate email to the Human Resources Director.

Ritter attests that, at her direction, all investigator positions were converted to paralegal positions in approximately February 2006, to better accommodate the Occupational Disease practice groups. Ritter attests that this resulted in Plaintiff requiring the job title of "Paralegal II". Ritter also attests that, because Plaintiff's work with the CSC (even after assuming the lead operator role) generated only a couple of hours of actual work a day "at the maximum", he was asked to help review



8

depositions. Ritter attests that Plaintiff initially ignored this email request, and only agreed to participate in the deposition review project after Crombie persisted. Ritter attests that around May 2, 2006, a box of depositions and a set of instructions were delivered to the Plaintiff, but that he evidently never opened the box for several months. Ritter also attests that Plaintiff's productivity on the deposition review project was by far the lowest of any paralegal assigned to the project: the average production was one hundred twenty-four (124) depositions for the six (6) primary paralegals assigned to the task, with the next lowest production to the Plaintiff being seventy-eight (78), excluding one secondary reviewer who produced thirty-six (36) depositions.[5] Ritter attests that, by contrast, Plaintiff produced only twenty-two (22) summaries.

Ritter attests that, given Plaintiff's failure to be a productive employee, other supervisors were not interested in adding him to their teams, and the firm had no opening in which he could be reasonably placed. Ritter attests that, as managing partner, she ultimately decided that the firm could no longer employ Plaintiff due to his lack of productivity and lack of an open position for him. She attests that she was the sole decision maker involved in Plaintiff's termination, and that although she relied on information provided to her by Crombie, she also based her decision on an objective review of all the relevant facts of which she had personal knowledge. Ritter attests that, in her opinion, Plaintiff was simply not performing adequately, and did not believe he could reasonably be placed in any other position with the firm. Ritter attests that she also personally decided to allow him to quit, rather than be fired, as a courtesy. Ritter attests that, out of respect for Plaintiff's long term service to the firm, she decided to allow him to remain with the Defendant for an extended period of time while he searched for another job, and that during this "exit period", Plaintiff was allowed to

---

[5]The secondary reviewer was Pat Rodgers, whose primary job was not reviewing depositions.



use work time to search for another job, go to interviews, work on his resume, "etc.". Ritter attests that Plaintiff was never promised any severance package, and that she, together with the Human Resources Director, personally explained to Plaintiff all the terms of his termination when they met with him on Friday, July 14, 2006.

Ritter attests that Plaintiff was given over eight (8) weeks notice of his termination, that Human Resources offered to help him with practice interviews, resume critique, and locating alternative employment, and that Plaintiff's termination was classified as a layoff so that he could receive unemployment benefits for his family. Ritter attests that Plaintiff's departure from the firm and any compensation or lack thereof had nothing to do with his race; rather, he was singularly unproductive, and the Defendant had no other position available for him. See generally, Ritter Affidavit, with attached Exhibit.

The Defendant has also provided numerous other exhibits, including excerpts of the Plaintiff's deposition, a document reflecting Plaintiff's deposition review production as compared to other employees (and as referenced in Ritter's Affidavit), a copy of Plaintiff's EEOC filing, a copy of the Defendant's harassment policy, and several case copies.

As attachments to his memorandum opposing summary judgment, Plaintiff has attached copies of some performance evaluations (Plaintiff's Exhibits 1-3), copies of some emails (Plaintiff's Exhibits 4-5), a copy of a memorandum to Kathy Ernst from the Plaintiff dated December 20, 2004 (Plaintiff's Exhibit 6), copies of various examples of Plaintiff's work product, of his interaction with supervisors and co-employees, and other employment documents. (Plaintiff's Exhibit 7-39). Plaintiff's Exhibits 40-42 relate to Plaintiff's discrimination filing with the EEOC. Plaintiff's Exhibit 43 is Plaintiff's resume, while Plaintiff's Exhibits 44-46 are copies of the Defendant's internal



news letter. Plaintiff's Exhibits 47-48 and 52-53 are copies of other employees' employment applications, Plaintiff's Exhibit 51 is a title and salary history for the Defendant's employees, and Plaintiff's Exhibit 54 is a Performance Evaluation for another employee. Plaintiff's Exhibits 55-64 are more copies of internal Motley Rice documents and/or emails dealing with the Plaintiff, other employees, and their interaction with each other and with the Defendant. Plaintiff's Exhibit 65 is a copy of material Plaintiff received from the EEOC pursuant to an FOIA request, which includes copies of employer information reports from the Defendant.

Plaintiff has also submitted an affidavit wherein he attests that he initially began working as a runner for Ness Motley in 1994. Plaintiff attests that in this position, he would drive across the country, transporting legal documents for trial as well as office furniture and equipment to be assembled by him when he arrived at the designated location, that he serviced many requests of different attorneys and paralegals while at trial, and that he also assisted paralegals in performing administrative duties, such as organizing and filing documents, fax routing, copying, some typing, and answering phone calls. Plaintiff attests that attorney Ron Motley and his staff and practice groups recognized the quality of his work and "began specifically requesting the Plaintiff for jobs instead of other runners". Plaintiff attests that this caused a strained relationship with his supervisor, Rose Sullivan, which resulted in his moving into an administrative position. Plaintiff attests that the paralegal designation was thereafter given to him when he transferred in 2001 from support staff and began working solely with practice groups. Plaintiff attests that his job required long hours and many different duties, and that he made a request for a salary review in hopes for a raise. Plaintiff attests that he received several "veil[ed]" responses, but never a raise.

Plaintiff attests that he performed extensive duties for Ron Motley during this period,



including securing and transporting trial materials daily, reviewing documents, gathering product identification or PID, corresponding with paralegals in other locations to gather materials, and taking care of transportation and miscellaneous items for expert witnesses, and taking care of various personal requests, in addition for being responsible for faxes and copying of documents, the stocking of office supplies, and the upkeep of the room designated as the office.

Plaintiff attests that for a time he was placed under the supervision of Stacy Rennix, even though Rennix told him Plaintiff did the same things he did. Plaintiff also attests that he remembers Motley making racially derogatory comments about him during dinner one evening, joking in front of several white attorneys that Plaintiff looked like a monkey walking across the courtroom floor. Plaintiff attests that he was extremely offended. Plaintiff further attests that Motley, to Plaintiff's "disbelief", would often point out that Plaintiff was black, stated that Plaintiff didn't know his own name, and made other degrading comments. Plaintiff attests that at an event on Motley's boat, he was presented with a stuffed gorilla which Motley and others referred to as "Little Jimmy". Plaintiff attests that Motley kept the stuffed animal around for years, well into late 2005, and would often ask him about "Little Jimmy". Plaintiff attests that he did not challenge these overtly racist incidents out of fear of retaliation.

Plaintiff attests that Motley never hired him officially as a member of his staff, so he also had to serve everyone else who made a request of him. Plaintiff attests that attorneys would often request his services, and that when he would state that he was otherwise occupied for the senior attorney, these other attorneys would abuse their authority over him. Plaintiff attests that this would sometimes cause conflicts in his scheduling, and on one occasion in Indiana Motley "publicly and harshly admonished" him because another attorney, Anne Kearse, had insisted that Plaintiff stop at



the site designated for Court when Motley had instructed him to meet him at the airport. Plaintiff attests that attorney Eugene Frazier witnessed this entire event.

Plaintiff attests that during this period of time, Anne Ritter was often critical of his work, even though he was performing to the satisfaction of the attorneys for whom he was working. Plaintiff also attests that on several occasions surrounding these trials, as well as at points during the normal work year, large raises and bonuses were given to select employees, and that although he [Plaintiff] received a bonus or bonuses, similarly situated white employees received larger bonuses. Plaintiff specifically attests that he learned that white employee Chris Stock had received a merit bonus for working normal hours from the home office on the trial in Indiana, even though Plaintiff had worked "exhaustingly" for the entirety of the two trials that Stock had worked on, and on the road. Plaintiff also states that the "overwhelming majority of black employees" under Ritter's administration were passed over for raises and merit bonuses while the majority of the employees that did receive merit bonuses were white. Plaintiff attests that when the Administration was asked about the criteria for choosing who received merit bonuses, it was explained that merit bonuses were given to employees who went "above and beyond", a term which was not explained.

Plaintiff attests that after the dissolution of Ness Motley, he was hired by the Defendant on or about 2003, where he worked independently as an investigator. Plaintiff attests that he initially worked exclusively for a diet drug litigation group, where he developed, organized, managed, and traveled to client screening sites all over the United States. Plaintiff attests that he received "rave reviews" from the lead attorney on this project, as well as a positive evaluation from Ritter, leading to his service being requested by several other attorneys in practice groups under the direction of Senior Paralegal Benee Wallace. Plaintiff attests that he gained tremendous experience, and that his



duties and experience fit that of an investigator more than a paralegal. Plaintiff attests that he requested Human Resources to review his position and duties, resulting in his title being changed in 2004.

Plaintiff attests that from late 2004 into 2005 he worked with the Canadian Asbestos litigation group, supervised by attorneys Anne Kearse and James Leadlie. Plaintiff states that in general he was not provided with sufficient assistance, and that his recommendations with respect to product identification were not followed, leading to problems for which he was blamed. Plaintiff attests that he was soon thereafter removed from the team, being advised that the team was "moving in another direction". Plaintiff attests that he "learned" that, after he left, the team began using the method he had tried to implement for their file reviews, although he concedes that another investigator was not put in his place.

Plaintiff attests that he was placed on the shared services team in late 2005, supervised by Roger Crombie. Plaintiff did not like the way this was handled, and "perceived Crombie as unconcerned with my employment interests." Plaintiff attests that although Crombie told him that he [Crombie] would find Plaintiff an assignment, after waiting "for over a month", Plaintiff went out and "found an assignment on my own . . . ." Plaintiff attests that he then informed Crombie of a pending assignment with the Aviation Team, and began working with that group the following day; however, Plaintiff attests that after a lack of response to an inquiry he had made, he "started looking through the emails", noted that Ritter had received an email with his name listed as a member of the Aviation Team, and that he "was sure that Ritter had interceded with the assignment". Plaintiff attests that he was later told by Crombie that the Aviation practice group was "going in a different direction . . . ." Plaintiff attests that he could see that Crombie "seemed to have an animus toward me", and while



Plaintiff acknowledges the aviation group did not hire a full time investigator, Plaintiff attests that "there was at least one new hire, a white individual, placed with the practice group after my removal". Plaintiff attests that Eugene Frazier, another African-American, was also removed from the Aviation practice group.

Plaintiff attests that in February 2006, all investigator titles were eliminated, and that he (the only black) received the designation of Paralegal II. Plaintiff attests that he worked with the diet drug litigation group and on some asbestos projects before Crombie eventually placed him with the CSC, where he worked with Bettina Honeycutt. Plaintiff states that he "felt that there was some impropriety and immediately challenged the move". Plaintiff also attests that he was advised he would be working in a "passive capacity" with Patti Bernier having the first line, giving rollover calls to him. However, Plaintiff attests that he "learned" that all of the calls were being routed to his telephone while he was also still working with various litigation groups. When Bernier subsequently left to pursue "other things", Plaintiff attests that he was not offered the lead role for the CSC, and that he became "aware" that a "fairly new employee" was going to be the lead representative for the CSC. Plaintiff also attests that as he continued to work with Crombie and Honeycutt, he "noticed that Crombie was allowing Honeycutt to push her work onto me". Plaintiff attests that he challenged this work arrangement on "several occasions", but that Crombie told him to "do as Honeycutt requested".

Plaintiff attests that in May 2006, he "presented" that he believed that it was unfair to have to work on as many projects as he was working on and to also have to do Honeycutt's work. Plaintiff further attests that during this period he received a "Good Finder" report from Hope Youngblood, a paralegal in Barnwell, South Carolina, which was a procedure for employees to let the Chief Operations Officer and other supervisors know that there was an employee who deserved



15

recognition for work related activities.  <u>See</u> <u>Plaintiff's Exhibits 31-32</u>.  Plaintiff attests that after

receiving these "accolades", Honeycutt attempted to pass more of her work onto him, even though he

did not "have the protections that my similarly situated white co-workers were afforded", and that

Crombie instructed him to make the CSC the priority over his other work.  Plaintiff also attests that

during this period he was "informed by another co-worker" that Honeycutt was making "slanderous

statements" about him., trying to have him terminated.  Plaintiff attests that when he brought this issue

to Crombie's attention, Crombie denied that Honeycutt was doing "anything of the sort", and then

began talking about Plaintiff's employment and performance.

       Plaintiff further attests that on one occasion when he had notified Crombie that he

would be attending a funeral, Honeycutt "caused a major issue when she had to answer the calls that

were coming in to the CSC . . . ."  Plaintiff attests that while he was attending the funeral he was

contacted by Kristin Bisigmama, Human Resources Assistant, at the request of Honeycutt.  Plaintiff

attests that when he returned to work on Monday, June 26, 2006, he received a series of emails from

Crombie about the missed phone calls and about the CSC voice mail.  Plaintiff states that he believes

Honeycutt and Crombie were "harassing" him, and he informed the Human Resources Director that

he was being "harassed".  Plaintiff attests that while these "serious violations were taking place", he

had to "endure being told on several occasions that there was no place for him to transfer to, while

other employees were being offered transfers and promotions".  Plaintiff attests that during this period

of time HR Director "Branner" would go to the offices of Alda Ayers and Patsy Austell and tell them

"about all of the work she was doing to find them a position in the firm".

       Plaintiff attests that on June 30, 2006, he received an email from Joe Rice informing

him to come to a meeting and bring the depositions that he was working on.  Plaintiff attests that when

16



he received this email, he "immediately called Rice on his mobile phone", and when Rice did not answer he "left a message asking that Rice be careful in this situation in judging [him] before hearing both sides". Plaintiff attests that Rice then deferred to Ritter, who told Plaintiff at a meeting that his "employment was to come to an end". Human Resources Director Elizabeth Branner also sat in on this meeting. Plaintiff attests that Ritter, who was also the direct supervisor of "the similarly situated" Honeycutt, told him the reason for his termination was non-performance. Plaintiff attests that, subsequently, Branner and Crombie called him to a meeting to tell him he was an unproductive employee, and to have him sign a memo to that effect. Plaintiff attests that although he objected to Crombie's characterization of him, he was forced to "go along with it", although he wrote next to his signature that "the above signed admits no guilt of any of these events".

Plaintiff attests that after he challenged the collusion and intentional conduct between Honeycutt and Crombie, which was controlled by Ritter and enforced by Branner, all whites, he was retaliated against by being forced to work "under duress". Plaintiff attests that he was allowed to continue to work "out of appreciation for [his] service", but was told that he should be using his time to find employment elsewhere. Plaintiff attests that Branner was constantly requesting that he submit a letter of resignation, and that he was under "an egregious amount of pressure" during this "end of employment time". Plaintiff states that the Defendant had no legal reason to terminate him, and that he was not treated the same as similarly situated white employees. See generally, Plaintiff's Affidavit.[6] Plaintiff has also provided a copy of his deposition in a separate filing (Court Docket No.

---

[6]Plaintiff also submitted a second "Affidavit of Evidentiary Support for the Plaintiff", in which he asserts in an unverified statement that he has been unable to obtain supporting affidavits from Motley Rice employees Ayers and Austell because these witnesses fear retaliation from the Defendant. No signed statements from either of these two individuals has been submitted, nor were their depositions taken.



147).

As attachments to its reply memorandum, the Defendant has provided an Affidavit from defense counsel attesting to Plaintiff's failure to provide some of the documents he has submitted in opposition to Defendant's motion for summary judgment during the discovery period, an employed persons occupation table, and an affidavit from Mina Agujia, current Director of Human Resources for the Defendant, attesting to the races of various individuals identified in the pleadings. The Defendant has also provided an affidavit from Anne Kearse, who attests that she is a member of the Defendant and in 2005 managed the Canadian project to which Plaintiff was assigned.

Kearse attests that this project involved the Defendant's representation of Canadian Workers' Compensations Boards, and that Plaintiff was given the responsibility of overseeing the product identification part of the project. Kearse attests that this involved ensuring that all claimant files had been thoroughly reviewed and documented for product identification and to determine what additional work needed to be completed for the claimant files, as well as working on current claimants and documenting product identification for the filing of claims. Kearse attests that Plaintiff's position required him to have the ability to report on the status of the overall project, work with other team members, synthesize the material, and assist in strategically planning and implementing the work necessary to file claims and maximize recovery for the Workers' Compensation Boards. Kearse attests that she did not feel that Plaintiff had a sound grasp of the essential nature of the project and what was required to timely ensure that claims were filed to meet their subrogation responsibilities. Kearse attests that she attempted to work with the Plaintiff, but that his performance did not meet her requirements, and that she prepared a memorandum of November 16, 2005 (see Plaintiff's Exhibit 8) expressing some of her frustration with his work. Kearse attests that this memorandum also attempted



to provide Plaintiff with more direction, but that she has no recollection of any reply from the Plaintiff. Not long afterward, it was determined that they would discontinue using Plaintiff with this project. <u>See</u> <u>generally</u>, <u>Kearse Affidavit</u>.

As an attachment to his motion for summary judgment, Plaintiff has submitted proposed findings of fact, as well as an affidavit wherein he attests that the "record of events submitted by the Plaintiff in these proceedings" are "true and accurate reporting of the events involving the Plaintiff while he was employed with the Defendant from 1994 until September 22, 2006".  In two additional affidavits, Plaintiff attests that the employee evaluations "contained with this document are true and accurate copies that were received by the Plaintiff, while he was employed with the Defendant", that the email correspondence and their attachments referenced as exhibits in his motion labeled beginning "JM" were produced by Plaintiff to counsel for the Defendant during discovery, and that the email correspondence and their attachments "contained in this documents" were produced by counsel for the Defendant during discovery, although they have been labeled with the Plaintiff's designation for purposes of his motion.  The emails, employment evaluations, and other documents referenced by the Plaintiff are attached as separate exhibits to Plaintiff's brief in support of his motion.

Finally, as attachments to its response in opposition to the Plaintiff's motion for summary judgment, the Defendant has submitted another copy of Ritter's affidavit with the attached memorandum from Roger Crombie, copies of numerous emails dealing with the Plaintiff and his employment situation and allegations, and another copy of the deposition reviewers comparative production statistics, showing Plaintiff was the lowest producing deposition reviewer for the PID project.



**Discussion**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990)

**I.**

**(Retaliation Claim)**

With respect to Plaintiff's retaliation claim (added by Plaintiff in his amendment to his Compliant of September 23, 2009), Defendant argues that Plaintiff did not exhaust his administrative remedies with respect to any such claim, rendering this claim subject to dismissal. After careful review of the arguments and evidence presented in this case, the undersigned is constrained to agree.

In order to bring a lawsuit in United States District Court under Title VII, a plaintiff is first required to properly exhaust his or her administrative remedies. Specifically, Title VII requires that a claimant file a charge of discrimination with the EEOC within one hundred and eighty (180)

20



days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state", within three hundred (300) days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency, or within thirty (30) days of the state agency's termination of its proceedings, whichever is earlier. See 42 U.S.C. § 2000e-5(e). Although South Carolina is a deferral state, Plaintiff initiated his complaint by filing an administrative charge with the EEOC. See Defendant's Exhibit 5. Therefore, Plaintiff had one hundred eighty (180) days from the alleged retaliatory acts complained of to file an administrative charge asserting his retaliation claim, and a failure by him to do so bars him from pursuing a Title VII retaliation claim in this Court.[7]

The administrative charge Plaintiff filed with the EEOC setting forth his claim of discrimination, as follows:

I.    I was hired by the above named employer in April, 1994, as a Runner/Courier.
      I last held the position of Paralegal II. I was forced to quit and was ultimately

---

[7]In its memorandum for summary judgment, Defendant states that Plaintiff had 300 days to file his administrative charge, and discusses Plaintiff's claims based on that time period. However, the charging documents filed with the Court show that Plaintiff filed his claim directly with the EEOC, and Plaintiff conceded at the hearing that he had filed his administrative claim with the EEOC. Since Plaintiff did not file his administrative charge with the appropriate state agency, but instead pursued this matter directly through the EEOC, the 300 day period is inapplicable. Guerrero v. University of Dist. of Colombia, 251 F.Supp.2d 13, 20, n. 8 (D.D.C. 2003); Hannum v. New Orleans Tree Service, No. 00-1766, 2000 WL 1100376 at * 3 (E.D.La. Aug. 7, 2000); cf. Bogle-Assegai v. Connecticut, 470 F.3d 498, 504-506 (2d Cir. 2006). Using the 180 day period, it is arguable that Plaintiff's claims are time barred. See Del.State College v. Ricks, 449 U.S. 250, 257-258 (1980)["[T]he only alleged discrimination occurred - and the filing limitations period commenced - at the time the tenure decision was made and communicated to [Plaintiff]."]; Hutson v. Wells Dairy, Inc., 578 F.3d 823, (8th Cir 2007)["A termination is a discrete act, not a continuing violation . . . . As such, a termination occurs - and thus triggers the start of the limitations period - on the day it happens . . . . The day is when the employer notifies the employee of the decision to terminate her employment."](internal citations omitted). However, if the EEOC transmitted Plaintiff's complaint to SCHAC, of which there is no evidence, Plaintiff may be able to argue that he should be given the benefit of a timely filing. Cf. Washington v. Patlis, 868 F.2d 172, 175 (5th Cir. 1989); see also, Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000). Since these issues have not been addressed by the parties, out of an abundance of caution, the undersigned has proceeded with a discussion of Plaintiff's claims.



laid-off the job effective September 22, 2006. Unlike my White counterparts, I was denied the opportunity for a lateral transfer and consideration for promotions. Also, upon termination of employment, and unlike my White, similarly situated counterparts, I was also denied a compensation/severance package.

II.     On August 30, 2006, Robin Collins, Staffing Specialist, informed me, via e-mail, that she was willing to put me through some "test" interviews and critique my resume. On September 13, 2006, Elizabeth M. Branner, Human Resources Director, confirmed, via e-mail, that September 22, 2006, was the date my employment was to end. Also, that my employer would pay me through my ending date even if I did not come to work, as they had willingly and voluntarily paid me weeks for time largely spent (at the employer's suggestion and support) on transition and job search issues. On September 16, 2006, Ms. Branner reiterated, via e-mail, that that my employer would allow me to resign, even though a position for my continued employment, because no attorney/Department Head agreed to take me onto a team/group where an opening existed.

III.    I believe that I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Defendant's Exhibit 5.

This EEOC charge does not make a claim of retaliation, nor did Plaintiff check the retaliation box on the form, instead only indicating that he was making a claim of race discrimination. Id. Hence, a plain reading of this administrative charge confirms that while Plaintiff exhausted his administrative remedies on his claim that he was discriminated against on the basis of his race with respect to the conditions of his employment and his termination, he made no claim in this administrative charge that he had been retaliated against for having engaged in protected activity.

In his response to the Defendant's motion for summary judgment, and as support for his argument that his retaliation claim should be allowed to continue, Plaintiff has submitted an exhibit (Plaintiff's Exhibit 40) which is an EEOC questionnaire Plaintiff filled out on August 31, 2006, seven months before he submitted his charge of discrimination. Plaintiff notes that, on Page



22

3 of this questionnaire, he circled "retaliation" as being one of the actions taken against him. However, this exhibit, standing alone, is not sufficient to save Plaintiff's retaliation claim. First, as noted by the Defendant, there is nothing on this exhibit to indicate that it was ever actually submitted to the EEOC, unlike Plaintiff's charge of discrimination which bears a received stamp as well as an EEOC charge number. Further, even if the Court assumes for purposes of summary judgment that this document *was* received by the EEOC, it is still by itself insufficient to save Plaintiff's retaliation claim. Cf. Semsroth v. City of Wichita, 304 Fed.Appx. 707 (10th Cir. 2008)[Completed questionnaire insufficient without more to constitute charge]. A review of the text of the questionnaire itself, wherein Plaintiff sets forth his allegations about what happened, contains no claim of protected activity or of retaliatory action by the Defendant. Plaintiff's Exhibit 40; Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 Fed.Appx. 844, 846-847 (11th Cir. Dec. 4, 2006)[Plaintiff failed to preserve wage claim when he circled wage claim on EEOC intake questionnaire, but did not include any facts in the explanation section and did not pursue it in his EEOC charge]; see Givs v. City of Eunice, 512 F.Supp.2d 522, 536-537 (D.La. 2007)[Finding that, even though Plaintiff had checked both the race and retaliation boxes on an EEOC complaint, "Plaintiff's failure to allege any facts concerning retaliation . . . that would have put the EEOC on notice about the possibility of such, [is] fatal to [this] claim []"].

      The actual administrative charge Plaintiff filed with the EEOC in March 2007 also does not set forth any retaliatory conduct by the Defendant, nor does it assert a retaliation claim in the section provided in which to do so. Defendant's Exhibit 5. Plaintiff himself also acknowledged at his deposition that the only complaint of discrimination he filed with the EEOC was his administrative charge, which did not contain a charge of retaliation; Plaintiff's Deposition, pp. 130-132; Defendant's



Exhibit 5; and none of the other documents from the EEOC indicate that any formal retaliation claim was investigated by that agency. See Plaintiff's Exhibits 41-42. Indeed, Plaintiff did not even amend his complaint to include a charge of retaliation until a year after the filing of his original complaint, stating therein that he was doing so because, "*[s]ince filing the original Complaint . . .* , I have become aware of certain elements and details that should be accounted for as the reason or cause for bringing this action." [Emphasis added]. See Court Docket No. 87-1.

   In sum, even when considered in the light most favorable to the Plaintiff, nothing in the evidence and exhibits submitted to this Court supports a finding, or is sufficient to give rise to a genuine issue of fact as to whether, Plaintiff exhausted his administrative remedies with respect to a Title VII retaliation claim, and Plaintiff may not now change, or add a new, theory of liability. Givs, 512 F.Supp.2d at 536-537; see Marshall v. Federal Exp. Corp., 130 F.3d 1095, 1098 (D.C.Cir. 1997) ["[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to timely file the EEOC charge."] (quoting Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989)). Therefore, as the record and evidence before this Court shows that Plaintiff failed to administratively exhaust his claim that he was retaliated against for engaging in protected activity, this claim is procedurally barred from consideration by this Court, and should be dismissed. Smith v. First Union National Bank, 202 F.3d 234, 247 (4th Cir. 2000) [EEOC charge "defines the scope of [a plaintiff's] subsequent right to institute a civil suit"]; Sloop v. Memorial Mission Hosp., Inc., 198 F.3d 147, 148 (4th Cir. 1999) [a Title VII claimant must first exhaust administrative remedies with regard to their claim before filing the claim in federal court]; Chacko v. Patuxent Institution, 429 F.3d 505, 509 (4th Cir. 2005); Polsby



24

v. Chase, 970 F.2d 1360, 1363 (4th Cir. 1992) ["Procedural requirements...for gaining access to the ...courts are not to be disregarded by courts out of a vague sympathy for particular litigants"], vacated on other grounds, 113 S.Ct. 1940 (1993). [8]

## II.

### (Disparate Treatment Claim)

Plaintiff's Title VII race discrimination claim is for disparate treatment, based on his assertion that he was subjected to racial discrimination in the terms of his employment and when he was terminated. Plaintiff's claim requires proof of intentional discrimination, either by direct evidence or by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Plaintiff has not offered any direct evidence of race discrimination,[9] and Defendant argues that

---

[8]It is worth noting that, at the hearing, Plaintiff also conceded that he had never made any complaint to a supervisor or Human Resource official that the believed he was being discriminated against because of his race. See also Plaintiff's Exhibits 35 [Complaint regarding salary, but no reference to race], 50 [Complaint regarding salary, but no reference to race]; Plaintiff's Deposition, p. 58. Therefore, even if Plaintiff had exhausted his administrative remedies with respect to this claim, it would be subject to dismissal in any event because there is no evidence that Plaintiff ever engaged in protected activity, a prerequisite to bringing a Title VII retaliation claim. Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006)["Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."] (citing Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir. 1997); Miller v. Am. Fam. Mut. Ins., 203 F.3d 997, 1008 (7th Cir. 2000)[holding that Plaintiff did not engage in a protected activity where "[h]er complaints instead concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them" and not discrimination based on a protected class]. "An employee can honestly believe [he] is the object of discrimination, but if [he] never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." Id. at 1008; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)[noting that Title VII is not a "general civility code for the American workplace."]; Albero v. City of Salisbury, 422 F.Supp.2d 549, 560 n. 43 (D.Md. 2006)[Complaints of favoritism are not sufficient, "[making] general workplace complaints is not protected activity."]

[9]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56
(continued...)



Plaintiff has failed to present sufficient circumstantial evidence to create a genuine issue of fact as to whether any of these alleged actions occurred because of his race under the <u>McDonnell Douglas</u> proof scheme[10] to survive summary judgment.

The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in <u>McDonnell Douglas</u>. <u>First</u>, Plaintiff must establish a prima facie case of discrimination. If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against him. <u>Second</u>, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reasons for its actions. <u>Third</u>, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the

---

[9](…continued)
F.3d 542, 548-549 (4th Cir. 1995), <u>rev'd on other grounds</u>, 517 U.S. 308 (1996); <u>Black's Law Dictionary</u>, 460 (6th Ed. 1990) (citing <u>State v. McClure</u>, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974); <u>see</u> <u>Williams v. General Motors Corp</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert. denied</u>, 455 U.S. 943 (1982).

[10]Plaintiff's claim could also be considered under the so-called "mixed-motive" analysis, even though Plaintiff has presented only circumstantial, or in-direct, evidence of discrimination. Under the mixed motive analysis, Plaintiff need not show race was the sole motivating factor, but only that it was a motivating factor. <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003). Historically, consideration of a claim under the mixed-motive analysis was only proper in direct evidence cases, but that is no longer the law. <u>See</u> <u>Hill v. Lockheed Martin</u>, 354 F.3d 277, 284-285 (4th Cir. 2004); <u>Mereish v. Walker</u>, 359 F.3d 330, 339-340 (4th Cir. 2004); <i>cf.</i> <u>Taylor v. Virginia Union Univ.</u>, 193 F.3d 219, 232 (4th Cir. 1999) [en banc].
However, since neither party has argued for consideration of Plaintiff's claim under a "mixed-motive" analysis, the undersigned has only evaluated Plaintiff's claim using the <u>McDonnell Douglas</u> analysis. <u>See</u> <u>Hopes v. Roche</u>, No. 04-2963, 2005 WL 1812820 at * 6 n. 2 (D.Md. Aug. 2, 2005) (citing <u>Nagy v. Baltimore Life Ins. Co.</u>, 49 F.Supp.2d 822, 836 n. 13 (D.Md. 1999) [declining to engage in "mixed-motive" analysis where parties have not argued a mixed-motive theory.])**.** In any event, in a mixed motive case, the bias must come from a relevant decisionmaker; <u>Hill</u>, 354 F.3d at 291; and although Plaintiff argues such bias exists, there is no evidence (direct or circumstantial) to show bias on behalf of the relevant decisionmakers. As discussed herein, Plaintiff has failed to show that his race played a role in the employer's decisionmaking process and had a determinative influence on the outcome. <u>See</u>, discussion, <u>infra</u>. Therefore, regardless of the analysis method, Plaintiff's claim fails.



26

burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's race. McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

   **Prima facie case**. In order for Plaintiff to establish his prima facie case of discrimination, the evidence must be sufficient to show (1) that he is a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he was subjected to an adverse employment action; and (4) that other employees who were not members of his protected class were treated more favorably, or there is some other evidence giving rise to an inference of unlawful discrimination. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995). See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119 (N.D.W.Va. 1996). With respect to Plaintiff's termination claim, the fourth prong of the prima facie case may require a showing that the position remained opened or was filled by similarly qualified applicants outside of Plaintiff's protected class. McDonnell Douglas, 411 U.S. at 802; Jyachosky v. Winter, 343 Fed.Appx. 871, 876 (4th Cir. Sept. 14, 2009); see Ennis v. National Ass'n of Business and Educational Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995)[The exact standard to be used in establishing a prima facie case is flexible depending on the factual situation and the claim alleged].



Defendant does not dispute that Plaintiff is a member of a protected class [African-American], and that he suffered an adverse employment action when he was terminated. Defendant argues, however, that Plaintiff has failed to prove the remaining elements of his prima facie case, requiring dismissal of his claims.

**Whether Plaintiff was performing his job satisfactorily.** With respect to this prong of the prima facie case, the Defendant has offered several exhibits to show deficiencies in Plaintiff's performance as an employee, going back as far as 2002. The evidence does show that Plaintiff was generally well liked, that he was retained by the Defendant after the original firm for which he worked, Ness Motley, dissolved in 2003, and Defense counsel conceded at the hearing that there were no material problems with Plaintiff's performance up to that time. However, Ritter attests in her affidavit that from 2003 to 2005 she found Plaintiff's work performance "wholly unsatisfactory". While Ritter fails to provide any specifics with regard to Plaintiff's work performance during that time (other than to state that he would sometimes "disappear" during work hours), Ritter further attests that, after Plaintiff was placed on the Canadian Asbestos team in 2005, he was not as productive as others on the team, leading the team to not retain his services. To support this assertion, the Defendant has also provided an affidavit from Anne Kearse, the head of this team, attesting to Plaintiff's poor performance. Kearse Affidavit; see also Plaintiff's Exhibit 8.

Plaintiff thereafter became a member of the "Shared Services" team, where his supervisor was Roger Crombie. On July 18, 2006, Crombie provided the Plaintiff with a written memorandum reflecting his opinion of Plaintiff's performance as an employee of Motley Rice. Ritter Affidavit, Exhibit 1. This memorandum states that in February or March of that year Plaintiff was assigned to be a back up service representative in the Client Service Center (CSC), which was by itself

28



not sufficient work for a full-time employee, but that when he was offered an opportunity to become the lead operator for the CSC, Plaintiff indicated he would only consider that assignment if it were accompanied by an increase in his compensation. Further, although Plaintiff ultimately agreed to take the lead role at the CSC, Plaintiff was not answering CSC phone inquires properly, nor did he maintain an appropriate log of calls received and what happened to those calls. Crombie's memorandum indicates that Plaintiff also resented any supervision he was receiving from Bettina Honeycutt, but that even though his supervision was changed to limit contacts between Plaintiff and Honeycutt, the problems with Plaintiff's performance at the CSC continued. Various other exhibits submitted by both the Defendant and the Plaintiff confirm the ongoing problems with the management of the CSC, although Plaintiff disputes the extent of these problems, or that he was the one responsible for any problems with the management of the CSC. See Plaintiff's Deposition, pp. 87-88; Defendant's Exhibit 2; Plaintiff's Exhibits 22, 26, 32-33, 60 .

Crombie's memorandum further discusses an incident involving Plaintiff going to the funeral of a co-worker. Crombie's memorandum indicates that Plaintiff was to attend the funeral on a Friday, with Crombie assuming that Plaintiff would be away from the office for a few hours that day. However, Plaintiff was not only gone all of Friday, but the calls coming into the CSC were not handled for a significant part of the preceding day (Thursday) as well. This is confirmed by other exhibits submitted by both parties. See Defendant's Exhibit 2; Plaintiff's Exhibits 26, 28. While these exhibits reflect the reasons Plaintiff offered for being gone on Friday (including the length of the funeral, where it was located, etc.), there is no indication in any of the exhibits provided to the Court as to why Plaintiff did not handle the cited CSC calls on Thursday, or that he had received any authorization from his supervisor to be gone on Thursday. See Plaintiff's Deposition, pp. 60, 90-94;



Defendant's Exhibit 2. During that period of time, a significant number of voice mail messages accumulated at the CSC, which had to be handled by Honeycutt. Plaintiff's Deposition, pp. 92-93; Defendant's Exhibit 2; Plaintiff's Exhibits 26, 28. Crombie's memorandum further indicates that, when he attempted to obtain an explanation from the Plaintiff, Plaintiff responded by sending an insubordinate email. See Plaintiff's Exhibits 28, 60. Plaintiff does not dispute the authenticity of these emails; indeed, many are his own exhibits.

Crombie's memorandum further details what he considered poor work performance by the Plaintiff with respect to a deposition review project in April and May of 2006. Crombie's memorandum indicates that a box of seventeen (17) depositions, together with a set of instructions and training materials, were delivered to Plaintiff's office, but that Plaintiff never even opened the box. Ritter further attests in her affidavit that Plaintiff's productivity on the deposition review project was by far the lowest of any of the paralegals assigned to that project, with the average production of the six primary paralegals assigned to the task being one hundred twenty-four (124) depositions (with the next lowest to the Plaintiff being seventy-eight (78)), while Plaintiff only produced twenty-two summaries. See also Defendant's Exhibit 4. Ritter attests that "[g]iven [Plaintiff's] failure to be a productive employee, other supervisors were not interest in adding [Plaintiff] to their teams, and the firm had no opening in which he could be reasonably placed. As managing partner, I ultimately decided that the firm could no longer employ [Plaintiff] due to his lack of productivity and the lack of an open position for him."

In response to Defendant's evidence and arguments, Plaintiff has submitted copies of several emails and letters where his work was being complemented. These documents generally describe Plaintiff as being dependable, reliable, and hard working. See Plaintiff's Exhibit 64. Plaintiff



has also provided copies of some of his performance evaluations, in which he is given good marks for his work. See Plaintiff's Exhibits 1-3. However, the performance evaluations are all from the period 2000-2002, when Plaintiff was working for Ness Motley, while the letters and/or emails he has provided date from 2003 to February 2005, prior to his work with the Canadian Asbestos team, or the problems cited by the Defendant with respect to the depositions, funeral and operation of the CSC. Karazanos v. Navistar Intern. Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991)[Although Plaintiff attempted to rely on earlier performance evaluations and raises, the Court held that "the issue is whether the employee was performing well at the time of his termination . . . 'whether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean he is qualified at a later time'"] (quoting Weihaupt v. American Medical Ass'n, 874 F.2d 419, 427 (7th Cir. 1989), quoting Grohs v. Gold Bond Bldg. Prods., 859 F.2d 1283, 1287 (7th Cir. 1988). Plaintiff has provided no evidence to dispute the Ritter and Kearse affidavits with respect to his performance as a member of the Canadian Asbestos team, or to create a genuine issue of fact as to whether his performance was other than that described in those affidavits. Cf. Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997)[In considering whether a claimant was adequately performing their job, it is the perception of the decision maker which is relevant, not the self assessment of the claimant]; King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003)[On a motion for summary judgment, a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the Plaintiff] was meeting [the employer's] expectations."]; cf. Kelliher v. Veneman, 313 F.3d 1270, 1276 n. 8 (11th Cir. 2002)[Plaintiff's assertion that his supervisor was "out to get him" did not prove pretext for age or race discrimination][pretext stage]; Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)[inquiry centers upon the employer's beliefs, and not the employee's own perception of her



performance][same].

Additionally, with respect to the specific incidents cited by the Defendant which, Defendant contends, precipitated Plaintiff's termination, the various emails and other internal Motley Rice documents submitted as evidence confirm that there were in fact problems associated with each of these work assignments. <u>Plaintiff's Deposition</u>, pp. 102, 144-145; <u>Plaintiff's Exhibits</u> 33, 60, 63; <u>Kease Affidavit</u>; <u>Ritter Affidavit</u>; <u>Defendant's Exhibit 4</u>; Exhibit 1 to <u>Ritter's Affidavit</u>. Specifically, these exhibits confirm that there were problems with calls being properly handled at the CSC, that a backup employee had to handle CSC calls for both the day Plaintiff attended the funeral as well as part of the previous day, and that Plaintiff reviewed the fewest number of depositions of anyone assigned to that task.

Plaintiff has offered several explanations as to why the problems and/or issues surrounding these events were not his fault or responsibility. First, Plaintiff argues that the phone system at the CSC was not working properly, and at the hearing cited to his Exhibit Number 24 as support for this claim. Plaintiff's Exhibit 24 is a series of emails dated April 27, 2006 between the Plaintiff, Honeycutt and Gayle Walsh, who is identified on the emails as a telecommunication specialist. In these emails, Honeycutt asked Walsh whether there was something "messed up yesterday with the phone system", because neither she nor the Plaintiff had received any rolled over CSC calls that day. Walsh replied that the only thing she had done with the CSC line was to delete the rollover from another employee's phone, so that if Plaintiff was away from his desk or on another CSC call, the call would go to the CSC voice mail. Walsh further states in her email that she had "just checked it and this line is working fine. Also just checked with [Plaintiff] and he told me he is getting calls today."



This exhibit does not support Plaintiff's claim that there was in general something wrong with the phone system at CSC. Nor does this exhibit appear to have anything to do with the operation of the CSC phone system over two (2) months later, on June 22 and 23, 2006, the days surrounding the funeral. See Plaintiff's Exhibit 26. With respect to that incident, while Plaintiff did ask off for the funeral, which was on Friday, June 23, there is no explanation in any of the material filed with the Court, nor was Plaintiff able to provide an explanation at the hearing, as to why he did not handle the CSC phone calls the previous day.[11]

Finally, with respect to the deposition issue, Plaintiff argued at the hearing that the reason he had done fewer depositions was because Crombie had "pulled him off" the deposition assignment, citing to his Exhibit 33. Plaintiff's Exhibit 33 is a series of emails between Plaintiff, Honeycutt, and Crombie dated May 19-23, 2006. The first email is an email to the Plaintiff from Honeycutt dated May 19 wherein Honeycutt is complaining that she is being "inundated by messages" from the CSC, and asking Plaintiff to please retrieve the messages and handle the calls and send the CSC call logs to the responsible paralegals.[12] When Plaintiff questions the number of messages Honeycutt had handled, Honeycutt responded that she had fielded over thirty-seven call so far that week, to which Plaintiff responded "Thank you". Three days later, May 22, 2006, Honeycutt emails Plaintiff to ask him if he had had a chance to "check vm's today", to which Plaintiff responded "No,

---

[11]At the hearing, Plaintiff argued that if Honeycutt checked the messages either late Thursday or early Friday, that may have deleted these messages from his phone system. In addition to this being mere speculation, however, it would not explain why Plaintiff did not handle the phone calls on Thursday, since the only time off he had asked for was on Friday, and it would also not change the fact that the phone calls from Thursday and Friday had not been properly handled.

[12]This was during the period of time that Plaintiff was the lead operator for the CSC, with Honeycutt assigned to handle any overflow. See Plaintiff's Exhibits 58-59; Exhibit One to Ritter Affidavit.



I wasn't informed that I was supposed to." Honeycutt responded in an email wherein she apparently conceded that Plaintiff had not received this instruction (describing it as "my bad"), and asking Plaintiff if he could manage for the rest of the week. The following day, May 23, 2006, Honeycutt emailed Plaintiff to tell him there were eleven new messages on the vm system, and asking him to please retrieve them. Plaintiff responded to this email by stating "I think we need to meet about this". Plaintiff then received an email from Crombie asking him if there was a problem with Plaintiff handling some of these calls, to which Plaintiff responds that Honeycutt seems to be unable to handle the calls, and that if there is a problem with her doing so, then they would need to make some adjustments. Plaintiff also complains that it was "almost impossible to read these depositions with an attentive eye and do the call center . . . .", to which Crombie responds by telling Plaintiff to "give [the call center] priority over the deposition review work" until "Linda gets back from her sick leave".[13] Plaintiff responds to Crombie "will do" on May 23, 2006.

In response to Plaintiff's argument that these emails show he was "pulled off" the deposition assignment, Defendant points out that these emails only cover a two day period in May 2006, while Plaintiff had the depositions to review from May 3, 2006 through September 20, 2006, over four and a half months. See Defendant's Exhibit 4. Counsel also argued at the hearing that these emails clearly show that Plaintiff was to give the call center job priority only while Miller was out sick, and that Plaintiff has submitted no evidence to show that Linda Miller was out sick for any extended period of time.[14] Counsel also argued that these emails do not show that Plaintiff was to stop

---

[13] These emails indicate that Linda Miller, who was assisting with the vm system, had been out sick since the previous day, May 22, 2006.

[14] The evidence on this issue is unclear. See Plaintiff's Exhibit 33; Plaintiff's Deposition, p. 136. However, it is apparent that Plaintiff spent some time on other matters as well. Cf. Plaintiff's

(continued…)



working on the depositions, but only that the call center phone calls should receive priority, and noted that Pat Rodgers, who had a full time, eight hour a day job assignment with the Defendant, was still able, working in her spare time, to complete thirty-six deposition reviews in a little over three months, while Plaintiff, whose only other job at the time was the CSC position which was not considered a full time job, taking only a few hours a day, only did twenty-two deposition reviews in four and a half months.  See Defendant's Exhibit 4, see also Plaintiff's Deposition, pp. 95-96  Plaintiff has not disputed either the number of depositions he completed, nor the number Defendant's exhibit shows that Rodgers completed.

In sum, while Plaintiff contends in his filings, and forcefully argued at the hearing, that he had a good job performance; see also Plaintiff's Exhibits 31-32; and that any problems arising from the incidents at issue were not of his doing, the evidence nevertheless reflects that, over a two day period in June 2006, he did not handle calls coming into the CSC, resulting in Honeycutt having to take these calls, with Plaintiff offering no explanation as to why he was not at least able to handle the calls from Thursday.  See also, Plaintiff's Deposition, pp. 90-93.  There is also no evidence to dispute the Defendant's evidence about the number of depositions Plaintiff handled vis-á-vis the number of depositions handled by other employees as part of that assignment, nor has Plaintiff presented any cogent evidence to show that general problems with the CSC phone system were the cause of the disputes he had with Crombie over his maintenance of the CSC office as is set forth in Crombie's memorandum of July 18, 2006.  Beall, 130 F.3d at 619 [In considering whether a claimant was

---

[14](…continued)
Exhibits 31-32, 37.  Additionally, part of the time Plaintiff was reviewing depositions was also during the time he had been told he was not being retained and was supposed to be using part of his work day looking for new employment.  Therefore, for purposes of summary judgment, the undersigned has assumed Plaintiff's assertion that he was not working full time on the deposition review to be correct.



adequately performing their job, it is the perception of the decision maker which is relevant, not the self assessment of the claimant]. Therefore, the undersigned cannot find that Plaintiff has submitted evidence sufficient to create a genuine issue of fact as to whether he was adequately performing his job in the time period leading up to his termination, one of the necessary prongs of his prima facie case of disparate treatment race discrimination. Cook v. CSK Transp. Corp., 988 F.2d 507, 513 (4th Cir. 1993) ["[U]nsupported allegations do not establish a prima facie case of race discrimination...."]; Causey v. Balog, 162 F.3d 795, 801-802 (4th Cir. 1998) [conclusory statements, without specific evidentiary support, do not support a claim for discrimination]; see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) [there must be evidence on which a jury could reasonably find for the Plaintiff]; Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ["unsubstantiated allegations" are insufficient to defeat summary judgment].

**Whether there is some other evidence giving rise to an inference of unlawful discrimination**. Turning to the fourth prong of Plaintiff's prima facie case, even assuming that there was sufficient evidence to create a genuine issue of fact as to whether Plaintiff was performing his job to his employer's satisfaction, there is insufficient evidence to give rise to an inference of unlawful discrimination in the Defendant's actions. First, Plaintiff has presented no evidence to show, and indeed does not even assert, that following his termination he was replaced by someone from outside his protected class. See Hudson v. Shaw Environmental & Infrastructure, Inc., 267 Fed.Appx. 892, 893-894 (11th Cir. May 6, 2008)[Plaintiff failed to establish a prima facie case for discriminatory termination where he was not replaced by a person outside the protected class.]. Indeed, the Defendant argues that Plaintiff was not replaced at all, pointing to the evidence in the record that one of the reasons Plaintiff was terminated was because there was not sufficient work available to justify



36

his full time position and salary.  See Plaintiff's Deposition, pp. 71, 135-136; Plaintiff's Exhibits 23

and 63; see Gamble v. Aranack Uniform Services, 132 Fed.Appx. 263, 267 (11th Cir. 205)[African

American former employee failed to establish a prima facie case of discriminatory demotion or

termination under Tittle VII, where his position was eliminated and employee was not replaced by

anyone, let alone a person outside of his protected class.].  As for Plaintiff's claim in his Complaint

that he did not receive a severance package when similarly situated white employees had, Plaintiff

conceded at the hearing that he had no evidence to show that any other employee, white or black,

received a severance package under circumstances similar to his while he did not, or even received

a severance package at all.[15]

  The other evidence cited to by the Plaintiff is also not sufficient to give rise to a

genuine issue of fact as to whether his treatment and/or termination were based on his race.  Plaintiff

attests in his affidavit that, while Branner was telling him she was unable to find him any work to do,

she was telling fellow employees Alda Ayers and Patsy Austell that she was working hard to find them

new positions.  However, assuming the truth of this statement for purposes of summary judgment,

neither of these employees was a comparator to the Plaintiff, a paralegal:  Ayers was an administrative

assistant, while Austell was a legal secretary.  Plaintiff's Exhibits 47-48, 51; see Smith v. Sunbelt

Rentals, Inc., 356 Fed.Appx. 272 at ** 6-7 (11th Cir. Dec. 10, 2009)[Plaintiff must show that he and

the comparable employee are "similarly situated in all relevant respects"].  In any event, Plaintiff has

---

[15]At the hearing, Plaintiff cited employee Stacey Rennix as a white employee who *may* have
received a severance package upon her termination.  See also, Plaintiff's Deposition, pp. 47-50.
However, Rennix is not a comparator to the Plaintiff, as she was a supervisor, an "exempt" employee
(whereas Plaintiff was as "non-exempt" employee), and in fact was even Plaintiff's supervisor for a
while, although Plaintiff did not agree with that designation.  Plaintiff's Deposition, p. 48; see also
Plaintiff's Exhibit 51.  In any event, Plaintiff conceded at the hearing that he did not even know if
Rennix had received a severance package.  See also, Plaintiff's Deposition, p. 50.



presented no evidence to show that any new positions were found for either of these two individuals; see also Plaintiff Deposition, p. 23.; nor has he offered any evidence to show that the Defendant had any job openings for someone of his particular skill set and experience, but which were instead given to less qualified white employees, or indeed to any other employees at all. Evans, 80 F.3d at 960 ["unsubstantiated allegations" are insufficient to defeat summary judgment]; cf. Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination].

Plaintiff has also presented no evidence to support his claim that white employees received incentive or merit bonuses for their work when he did not. Plaintiff's Exhibit 51 is a listing of all of the Defendant's employees and their salaries. However, this document (which is not dated) does not show degrees of experience, bonuses received, specific work performed, or even the races of any of these employees, and is therefore not by itself a basis from which a finder of fact could conclude that Plaintiff was discriminated against in the terms of his salary and/or bonuses and/or promotions based on his race. When asked at the hearing which employees Plaintiff considered to be comparators for purposes of this claim, Plaintiff identified four specific employees (all white); Josh Treece, Keith Winn, Chris Stock and Stacey Rennix.[16] However, Rennix is not a proper comparator for the Plaintiff for the reasons already noted, while Treece is not listed as an employee on Plaintiff's Exhibit 51, and the Court therefore has no information about him other than that he was apparently an investigator. See Plaintiff's Deposition, pp. 112, 115; Plaintiff's Exhibit 30 . Stock is listed as a

---

[16]Plaintiff did not at the hearing identify Honeycutt as being one of his comparators, although she is repeatedly referred to in his filings as being a comparator.

38



Paralegal II (hired 9-29-03), while a "Terry" Winn is listed as an Investigator III (hire date 9-27-99).[17]

No other information is provided with respect to any of these employees, to include their work assignments, their educational and work histories, or any other information from which this Court could make a finding as to whether they are similarly situated to the Plaintiff and/or whether there is any disparity in their wages, bonuses or job assignments such as would give rise to an inference of unlawful discrimination. See Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 760 (4th Cir. 1998)[In order to succeed on a failure to promote claim, a Plaintiff must ordinarily show that they were more qualified for the position than the individual who actually received the position], rev'd on other grounds, 119 S.Ct. 2388 (1999), aff'd on reh'g, 206 F.3d 431 (4th Cir.  ), cert. denied, 121 S.Ct. 66 (2000); Hawkins v. Pepsico, Inc., 203 F.3d 274, 281 (4th Cir. 2000) [affirming grant of summary judgment to the employer where the employee did not "show that...[the] problems were racial in nature"]; Yarnevic v. Brink's Inc., 102 F.3d 753, 757-758 (4th Cir. 1996) [holding that remote inferences and conclusory allegations cannot defeat summary judgment].

Finally, Plaintiff has submitted no evidence whatsoever of any racial animus on the part of Ritter, Crombie, Kearse, Honeycutt, Branner, or anyone else involved in the incidents and allegations giving rise to the alleged unfair employment practices or his termination. The undersigned has carefully reviewed the voluminous internal emails and other documents submitted by the Plaintiff, and while it is apparent from these documents that Ritter was less than impressed by Plaintiff's work performance, and perhaps did not even like him (a description which might also apply to Honeycutt), there is nothing in any of these documents to show any racial animus on the part of any of these individuals, or to give rise to a genuine issue of fact that race was involved in their decisions in any

---

[17]It is not clear if this individual is the "Keith Winn" identified by Plaintiff at the hearing.



way. While Plaintiff's sworn statements as to the conduct of attorney Ronald Motley, assumed to be true for purposes of summary judgment, could give rise to an inference that Motley had a racial animus or degree of insensitivity, all of the evidence submitted by Plaintiff concerning Motley was for the period 2000 through, at the latest, 2005, prior to the time of the incidents giving rise to Plaintiff's termination, with most of it being when Plaintiff was employed by a predecessor law firm. Cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) ["Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden" of proving discrimination]; Koski v. Standex, Int'l Corp., 307 F.3d 672, 678 (7th Cir. 2002)[Pertinent inquiry is whether the decision maker, as opposed to other managers, have evaluated the aggrieved employee based upon discriminatory criteria]; see also Hill, 354F.3d at 291.

The evidence shows that when Motley Rice was formed in 2003, Anne Ritter became the managing partner for that new entity, with Plaintiff being offered a job with that new entity. The Defendant was certainly aware of Plaintiff's race when he was hired, and Plaintiff offers no plausible argument for why, having willingly hired an African-American in the first place, the Defendant would then decide to fire him because he is an African-American. See Sullivan v. River Valley School District, 197 F.3d 804, 815 (6th Cir. 1999), cert. denied, 530 U.S. 1262 (2000) ["Without a showing that those other reasons were discriminatory, [Plaintiff] cannot establish a prima facie case for relief....]; see generally, Buhrmaster v. Overnight Transp. 61 F.3d 461, 464 (6th Cir. 1995) ["[A]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class."], cert. denied, 516 U.S. 1078 (1996).

Significantly, when asked at the hearing why he believed he had suffered the alleged unfair or adverse employment actions because of his race, Plaintiff essentially argued that, because



he is black while all of the other individuals cited in the evidence are white, he believed Ritter and/or Crombie treated Honeycutt more favorably on that basis. This argument, no matter how heartfelt, is simply not the standard for a Title VII discrimination claim. Nichols v. Caroline County Bd. of Educ., 123 F.Supp.2d 320, 327 (D.Md. 2000)[Plaintiff's contention that white supervisors subjected him to adverse employment actions "because I am who I am" insufficient to establish a racial character to their disagreements and misunderstandings]; Cook, 988 F.2d at 513 ["[U]nsupported allegations do not establish a prima facie case of race discrimination...."]; Causey, 162 F.3d at 802 [conclusory statements, without specific evidentiary support, do not support a claim for discrimination]; see also Harris v. Wackenhut Services, Inc., 648 F.Supp.2d 53, 68 (D.D.C. 2009)[Pretext stage].

In order to proceed on this claim, Plaintiff must present *evidence* sufficient to give rise to a genuine issue of fact that his treatment was based on race discrimination, not because the Defendant made a mistake (assuming the evidence showed any such mistake), treated him unfairly, or was simply incorrect in its findings or decisions concerning Plaintiff's employment. See Sullivan v. River Valley School District, 197 F.3d 804, 815 (6th Cir. 1999), cert. denied, 530 U.S. 1262 (2000) ["Without a showing that those other reasons were discriminatory, [Plaintiff] cannot establish a prima facie case for relief...."]; Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 680 (7th Cir. 1997) ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."]; Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); cf. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md. 1995) ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"],



citing <u>Turner v. Texas Instruments, Inc.</u>, 555 F.2d 1251, 1257 (5th Cir. 1977); <u>Colbert v. Tapella</u>, 677

F.Supp. 2d 289, 295 (D.D.C. 2010)(quoting <u>Hairsine v. James</u>, 517 F.Supp.2d 301, 308-309 (D.D.C.

2007)["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff]

wishes because federal courts are not review boards for local employment decisions . . . . A personnel

decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII

protects discriminatory decisions, not wrong ones."].  Plaintiff has failed to submit any such evidence.

Based on the foregoing, the undersigned cannot find that Plaintiff has submitted

evidence sufficient to create a genuine issue of fact as to either the second or fourth prongs of his

prima facie case of disparate treatment race discrimination.  <u>Gairola v. Virginia Dep't of General

Services</u>, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only

evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable

treatment was the result of discrimination...."]; <u>Boden</u>, 978 F.Supp. at 659 [former employee's own

subjective belief and conclusory statements that he had been discriminated against are not sufficient

to raise reasonable inference of unlawful discrimination].  This cause of action must therefore be

dismissed.  <u>Hawkins</u>, 203 F.3d at 281 [affirming the grant of summary judgment to the employer

where the employee did not "show that...[the] problems were racial in nature"]; <u>Beale v. Hardy</u>, 769

F.2d 213, 214 (4th Cir. 1985) [A party opposing summary judgment "cannot create a general issue of

fact through mere speculation or by the building of one inference upon another."].

**Conclusion**

Based on the foregoing, it is recommended that the Plaintiff's motion for summary

judgment be **denied**, that the Defendant's motion for summary judgment be **granted**, and that this

case be dismissed.



42

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

May 4, 2010
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a Defendants' Exhibit novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

